Affirmed by published opinion. Judge SPENCER wrote the opinion. Judge DAVIS wrote a concurring opinion. Judge NIEMEYER wrote a dissenting opinion.
OPINION
SPENCER, District Judge:
This matter is before the Court on the Defendants’ appeal of the Western District of Virginia’s grant of Summary Judgment in favor of the Plaintiffs. At issue is the constitutionality of Va.Code Ann. Section 18.2-391 (Michie Supp.1999) (amended 2000), which criminalizes the dissemination of material harmful to minors over the Internet. The District Court found the statute invalid under both the First Amendment and the Commerce Clause. For the reasons discussed below, the District Court’s ruling granting summary judgment and striking down the statute is AFFIRMED.
I. Background
Plaintiffs represent a spectrum of businesses, membership organizations, and in *230 dividuals who use the Internet[1] to communicate, display, and to seek access to a broad range of speech. Plaintiffs communicate online both within and from outside the Commonwealth of Virginia, and Plaintiffs’ speech is accessible both within and outside of Virginia. Plaintiffs all fear that their online speech could be considered “harmful to juveniles” in some communities under Virginia Code section 18.2-391, despite the fact that their speech may receive full constitutional protection as to adults. Plaintiffs facially challenged the constitutionality of section 18.2-391 and were granted a permanent injunction by the United States District Court for the Western District of Virginia enjoining the enforcement of the statute.
Since 1970, Virginia has prohibited the knowing display in “brick and mortar” space, of commercial materials that are harmful to juveniles. Va.Code Ann. § 18.2-391 (Michie Supp.1999) (amended 2000). In 1985, Virginia amended the statute, making it also unlawful “to knowingly display” these materials “in a manner whereby juveniles may examine and peruse” them. 1985 Va. Acts, ch. 506. Several plaintiffs brought suit challenging the 1985 amendment as facially unconstitutional on the grounds that it was impermissi-bly vague and violated the First Amendment. After a tortuous path through the courts, the statute was eventually upheld by the Fourth Circuit in light of a narrowing construction accorded to the statute by the Supreme Court of Virginia. American Booksellers Ass’n v. Virginia, 882 F.2d 125, 126 (4th Cir.1989).
The statute was reenacted as amended in 1999 to include electronic files or messages, and was again reenacted as amended in 2000. The statute in its present form makes it unlawful to “sell, rent or loan to a juvenile” or to knowingly display for commercial purposes in a manner whereby juveniles may examine and peruse:
1. Any picture, photography, drawing, sculpture, motion picture film, electronic file or message containing an image, or similar visual representation or image of a person or portion of the human body which depicts sexually explicit nudity, sexual conduct or sadomasochistic abuse and which is harmful to juveniles, or
2. Any book, pamphlet, magazine, printed matter however reproduced, electronic file or message containing words, or sound recording which contains any matter enumerated in subdivision 1 of this subsection, or explicit and detailed verbal descriptions or narrative accounts of sexual excitement, sexual conduct or sadomasochistic abuse and which, taken as a whole, is harmful to juveniles.
Va.Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000) (emphasis added). A violation of section 18.2-391 is a Class I misdemeanor.
The 2000 Amendment adds the following:
[I]f a person uses services of an Internet service provider or an electronic mail service provider in committing acts prohibited under this subsection, such Internet service provider or electronic mail *231 service provider shall not be held responsible for violating this subsection.
Ya.Code Ann. § 18.2-391 (Michie Supp. 1999) (amended 2000). The amendment creates a defense for Internet service providers (ISPs) and email service providers when a person violating the statute uses an ISP or email service provider as the medium through which to disseminate prohibited material. The ISP or email service provider, however, would be liable if it disseminated the material itself as opposed to serving as the gateway through which the material passes.
In relation to the statute, Virginia Code section 18.2-390(6), defines the term “harmful to juveniles” as:
that quality of any description or representation, in whatever form, of nudity, sexual conduct, sexual excitement, or sadomasochistic abuse, when it
(a) predominately appeals to the prurient, shameful or morbid interest of juveniles,
(b) is patently offensive to prevailing standards in the adult community as a whole with respect to what is suitable material for juveniles, and
(c) is, when taken as a whole, lacking in serious literary, artistic, political or scientific value for juveniles.
Section 18.2-390(7) defines “knowingly” as:
having general knowledge of, or reason to know, or a belief or ground for belief which warrants further inspection or inquiry of both (a) the character and content of any material described herein which is reasonably susceptible of examination by the defendant, and (b) the age of the juvenile, provided, however, that an honest mistake shall constitute an excuse from liability hereunder if the defendant made a reasonable bona fide attempt to ascertain the true age of such juvenile.
The relevant “community” whose standards govern what is harmful is undefined, as is “commercial purpose.”
Plaintiffs filed their Complaint and Motion for Preliminary Injunction in the United States District Court for the Western District of Virginia in December of 1999. The Honorable James H. Michael, Jr., United States District Court Judge, granted Plaintiffs’ Motion for Preliminary Injunction by Order and Memorandum Opinion on August 10, 2000. Plaintiffs then filed a Motion for Summary Judgment Granting Final Injunction, which the District Court granted on October 11, 2001. The Commonwealth appealed the summary judgment decision.
This Court accepted the appeal and oral arguments were scheduled on October 28, 2002. On January 21, 2003, this Court certified the following questions of law to the Supreme Court of Virginia:
A. Would the use of any of the technological access controls identified by the Attorney General of Virginia preclude conviction under Virginia Code § 18.2-391 as amended in 1999?
B. Does the prohibition against knowingly displaying pornographic materials that are “harmful to juveniles” apply to displays made only in connection with the sale, rental, or loan of such materials? If not, what must the government establish to prove that a defendant has knowingly displayed such material “for commercial purpose”?
PSINet, Inc. v. Chapman, 317 F.3d 413, 419 (4th Cir.2003). On September 12, 2003 the Supreme Court of Virginia advised this Court that pursuant to Rule 5:42 it would not furnish answers to the certified questions because the answers would not be outcome determinative.
The Commonwealth argues two issues on appeal. First, that American Booksel *232 lers is binding precedent in this case and therefore, the statute should not be subject to another facial challenge. Second, that the District Court erred in granting Plaintiffs’ Motion for Summary Judgment and request for Final Injunction. Because we find that a facial challenge to the statute is appropriate given the facts of this case and that Plaintiffs were entitled to summary judgment and a final injunction, we AFFIRM the District Court’s ruling.
II. Analysis
A Plaintiffs’ Facial Challenge
The Commonwealth argues that the 1999 Act did not enlarge the scope of section 18.2-391 and that this Court’s binding precedent in American Booksellers, precludes another facial challenge. The pre-1999 version of the statute, which did not explicitly reference electronic materials, contained two “catch-all” provisions. In reference to harmful print materials, explicitly including books, pamphlets, etc., the statute included the catch-all provision “however reproduced.” In reference to harmful representational materials, the statute included the catch-all provision “or similar visual representation or image.” According to the Commonwealth, electronic materials, both print and representational, fit comfortably within these two catchall provisions and the 1999 amendment merely explicitly included electronic materials that were already implicitly encompassed by the statute.
The Commonwealth’s arguments, however, are misguided. We agree with the District Court that a reading of section 18.2-391 illustrates that the catch-all phrases do not cover Internet material. It is disingenuous for the Commonwealth to argue that when the 1985 version of the statute was adopted the Virginia legislature intended to regulate the vast Internet material of today. Especially given that the legislature felt compelled to amend the Act in 1999 to include “electronic file[s] or message[s] containing words ... and ... images.” Va.Code Ann. § 18.2-391 (Mi-chie Supp.1999) (amended 2000).
General principles of statutory construction require a court to construe all parts to have meaning and to reject constructions that render a term redundant. See Reiter v. Sonotone Corp., 442 U.S. 330, 339, 99 S.Ct. 2326, 60 L.Ed.2d 931 (1979) (where the Supreme Court explained that a court is “obliged to give effect, if possible, to every word”); Platt v. Union Pacific R.R. Co., 99 U.S. 48, 58-59, 25 L.Ed. 424 (1878) (if a construction renders a term redundant, that is a reason for rejecting that construction); Virginia v. Browner, 80 F.3d 869, 877 (4th Cir.1996) (a court should not “construe a statute in a manner that reduces some of its terms to mere surplusage”); United States v. Snider, 502 F.2d 645, 652 (4th Cir.1974) (all parts of a statute must be construed so that each part has meaning); McLean Bank v. Nelson, 232 Va. 420, 427, 350 S.E.2d 651, 656 (1986) (Virginia statutory interpretation requires that all words of a statute be given meaning where possible). The Virginia legislature’s decision to amend section 18.2-391 to include electronic communications was not a redundant act simply including an area already covered by the Act, but was an affirmative step making the Act applicable to Internet communication. Thus the amendment was clearly a purposeful extension of the Act to a new area of communication, and Plaintiffs may facially challenge the Acts constitutionality as reenacted.
Furthermore, this Court’s decision in American Booksellers does not preclude Plaintiffs’ facial challenge. In American Booksellers v. Virginia, 882 F.2d 125 (4th Cir.1989) this Court only considered *233 whether non-obscene adult materials could be displayed and sold to adults in stores so long as sellers did not “knowingly afford [ ] juveniles an opportunity to peruse harmful materials.” Id. at 127. After the Supreme Court of the United States certified questions to the Supreme Court of Virginia, this Court concluded that the 1985 Act merely required booksellers to segregate a few works onto a shelf located where bookstore personnel would notice inappropriate juvenile interest while carrying out their regular duties. See id. at 127.
Moreover, this Court’s First Amendment analysis in American Booksellers dealt with traditional bookstores at physical locations and does not apply to the “unique and wholly new medium of worldwide human communication” that is the Internet. Reno, 521 U.S. at 850, 117 S.Ct. 2329. Nor does selling adult books and magazines in a fixed location raise the Commerce Clause concerns that state regulation of the Internet raises. See Jack L. Goldsmith & Alan O. Sykes, The Internet and the Dormant Commerce Clause, 110 Yale L.J. 785, 824 (2001).
One facial challenge of a statute does not preclude another challenge of an amended statute on different grounds. Plaintiffs were permitted to bring a facial challenge of Virginia Code section 18.2-391 (Michie Supp.1999) as amended and the District Court’s decision enjoining section 18.2-391 was proper.

B. The District Court’s Grant of Summary Judgment

On October 11, 2001, the District Court granted Plaintiffs’ Motion for Summary Judgment and entered a Final Injunction against the enforcement of section 18.2-391. A motion for summary judgment should be granted only if there is no genuine dispute as to an issue of material fact and the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). All facts and reasonable inferences must be interpreted in the light most favorable to the non-moving party. See Miller v. Leathers, 913 F.2d 1085, 1087 (4th Cir.1990). However, summary judgment is appropriate “where the facts and the law will reasonably support only one conclusion.” Hawkins v. Pepsi-Co, Inc., 203 F.3d 274, 279 (4th Cir.2000)(quoting McDermott Int’l, Inc. v. Wilander, 498 U.S. 337, 356, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991)). This Court reviews the grant or denial of summary judgment de novo. Hodge v. Jones, 31 F.3d 157, 163 (4th Cir.1994). In that the undisputed material facts and law reasonably support only one conclusion in the case at hand, we AFFIRM the District Court’s grant of summary judgment.

1. First Amendment Analysis

The District Court held that in seeking to restrict the access of minors to indecent material on the Internet, section 18.2-391 imposes an unconstitutional burden on protected adult speech. As a content-based restriction on expression, the statute may only be upheld if it survives strict scrutiny. United States v. Playboy Entertainment Group, Inc., 529 U.S. 803, 120 S.Ct. 1878, 146 L.Ed.2d 865 (2000) (applying strict scrutiny to a law restricting explicit programming); Reno I, 521 U.S. at 870, 117 S.Ct. 2329 (applying strict scrutiny to regulation of Internet speech). Strict scrutiny requires the law in question to be 1) narrowly tailored to 2) promote a compelling government interest. Playboy, 529 U.S. at 813, 120 S.Ct. 1878.
The government has the burden of showing that a content-based regulation of speech “is necessary to serve a compel *234 ling state interest.” First Nat’l Bank v. Bellotti, 435 U.S. 765, 786, 788-89, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978). It is clear that the government’s interest in protecting minors from sexually explicit Internet materials is compelling. See Ginsberg v. New York, 390 U.S. 629, 639, 88 S.Ct. 1274, 20 L.Ed.2d 195 (1968) (recognizing New York’s compelling interest in limiting the availability of sexual material to minors); FCC v. Pacifica Found., 438 U.S. 726, 749, 98 S.Ct. 3026, 57 L.Ed.2d 1073 (1978) (recognizing the government’s interest in limiting the broadcast of offensive words dealing with sex that was accessible to children). The question then becomes whether the Act is narrowly tailored so that it may pass strict scrutiny.
Both sides concede that the 1999 Act is not narrowly tailored if it effects a total ban on the display of all “electronic file[s] or message[s],” containing “harmful” words, images or sound recordings, that juveniles may “examine and peruse,” as the plain language of the statute seems to indicate. See Va.Code Ann. § 18.2-391 (Michie Supp.1999) (amended 2000). To save the statute from unconstitutionality the Commonwealth proposes certain statutory interpretations. However, even with the Commonwealth’s creative constructions, the statute remains unconstitutionally overbroad or becomes impotent and thus unconstitutional under the First Amendment.
The Constitution provides significant protection “from overbroad laws that chill speech within the First Amendment’s vast and privileged sphere.” Ashcroft v. Free Speech Coalition, 535 U.S. 234, 244, 122 S.Ct. 1389, 152 L.Ed.2d 403 (2002). Under the doctrine of overbreadth, a statute violates the First Amendment if it prohibits a substantial amount of protected expression. Id. In that section 18.2-391 penalizes a substantial amount of speech that is constitutionally protected, it violates the First Amendment.
Several courts have struck down general bans and blanket restrictions on Internet speech deemed harmful to juveniles as unconstitutionally overbroad. The Commonwealth suggests that we interpret section 18.2-391 as regulating only Internet speech occurring within the Commonwealth of Virginia. However, other statutes with that same geographic restriction have been struck down as impermissibly chilling to protected speech. See generally, American Libraries Ass’n. v. Pataki, 969 F.Supp. 160 (S.D.N.Y.1997). Attempting to localize Internet regulation is extremely problematic because the Internet “by its nature has no local areas.” Charles Nesson & David Marglin, The Day the Internet Met the First Amendment: Time and the Communications Decency Act, 10 Harv. J.L. & Tech. 113, 131 (1996).
Other courts have explained that:
[A]n Internet user cannot foreclose access to her work from certain states or send differing versions of her communication to different jurisdictions. In this sense, the Internet user is in a worse position than the truck driver or train engineer who can steer around Illinois or Arizona, or change the mudguard or train configuration at the state line; the Internet user has no ability to bypass any particular state. The user must thus comply with the regulation imposed by the state with the most stringent standard or forego Internet communication of the message that might or might not subject her to prosecution.
Pataki, 969 F.Supp. at 183. In fact, based on the pleadings of the parties and the findings of other federal courts, the District Court found that for “most communications over the Internet, the speaker *235 has little or no effective control over whether minors or adults are able to gain access to his communications.” Dist. Ct. Op. J.A. at 298 (citing Reno, 521 U.S. at 855-56, 117 S.Ct. 2329). The District Court found that “speakers who publish on the Web generally make their materials publicly available to users around the world, regardless of age, and lack any practical or reliable means for preventing minors from gaining access to the information on their sites or for verifying the true age of users of their Web sites.” Id. The District Court went further to explain that the Internet is:
[W]holly insensitive to geographic distinctions, and Internet protocols were designed to ignore rather than to document geographic location. While computers on the Internet do have “addresses,” they are addresses on the network rather than geographic addresses in real space. Most Internet addresses contain no geographic information at all. An Internet user who posts a Web page in one state cannot readily prevent residents of other states from viewing that page, or even discern in which state visitors to the site reside.
Dist. Ct. Op. J.A. at 298 (citing Pataki, 969 F.Supp. at 170). In that Internet speakers have no way of preventing Virginia juveniles from accessing their Internet speech, the “severity of criminal sanctions may well cause speakers to remain silent rather than communicate even arguably unlawful words, ideas, and images.” Reno, 521 U.S. at 872, 117 S.Ct. 2329. In an attempt to deny minors access to potentially harmful speech, section 18.2-391 will “effectively suppress[ ] a large amount of speech that adults have a constitutional right to receive and to address to one another.” Id. at 874, 117 S.Ct. 2329. Individuals who wish to communicate images that might fall within the statute’s proscriptions must thus self-censor or risk prosecution. It is this type of regulation, of otherwise protected speech, that other courts have consistently struck down as unconstitutional.
The Commonwealth asks the Court to read other propositions into section 18.3-391 under the guise of narrowing constructions. The Commonwealth suggests that section 18.2-391 be read as providing a defense when a Web site requires an adult PIN number for access.
Under the Commonwealth’s construction of section 18.2-391, a Web site employing a security screen requiring an adult PIN will be immune from prosecution. These PINs can be obtained through adult PIN registration services online, or the Web site could distribute PINs itself. An adult would obtain a PIN by providing a credit card number to the service.[2] Dist. Ct. Op. J.A. at 13-14.
The Commonwealth argues that an affirmative defense for PIN numbers must be read into section 18.2-391 in light of the Supreme Court of Virginia’s previous narrowing construction in Commonwealth v. American Booksellers Ass’n., 236 Va. 168, 178, 372 S.E.2d 618, 624-25 (1988). The Supreme Court of Virginia explained that to prove a violation under section 18.2-391, in the context of a physical bookstore, “the Commonwealth would have the burden of proving beyond a reasonable doubt that the defendant bookseller knowingly afforded juveniles an opportunity to peruse harmful materials, or took no reasonable *236 steps to prevent such perusal when the juvenile’s opportunity was reasonably apparent to the bookseller.” Id. (emphasis in original). The Commonwealth is persuaded and urges upon the Court that the language, “reasonable steps to prevent such perusal,” in the 1988 American Booksellers decision should be construed as allowing an affirmative PIN number defense to the 1999 amendment of the Act.
The general principle is that “every reasonable construction must be resorted to, in order to save a statute from unconstitutionality.” Edward J. DeBartolo Corp. v. Florida Gulf Coast Bldg. & Const. Trades Council, 485 U.S. 568, 575, 108 S.Ct. 1392, 99 L.Ed.2d 645 (1988). However, only if a statute is “readily susceptible” to a narrowing construction will the court apply such a construction to save an otherwise unconstitutional law. Virginia v. American Booksellers Ass’n, Inc., 484 U.S. 383, 397, 108 S.Ct. 636, 98 L.Ed.2d 782 (1988). The Supreme Court has explained that narrowing constructions are only appropriate when “the text or other source of congressional intent” identifies a clear line that a court could draw. Reno, 521 U.S. at 884, 117 S.Ct. 2329. Courts must be careful not to invade upon the legislative domain and a court should never “rewrite a law to conform it to constitutional requirements.” See Reno, 521 U.S. at 884-85, 117 S.Ct. 2329.
The Commonwealth’s PIN number defense is not “readily susceptible” from the text or any other source of congressional intent. Such a reading adding an affirmative PIN number defense might be possible if not for the Virginia legislature’s decision to explicitly state the defenses applicable to section 18.2-391. In 2000, just one year after it enacted the language making section 18.2-391 applicable to Internet communication, the Virginia legislature went back and amended section 18.2-391 to explicitly add the one defense that it intended to include. The 2000 amendment limits the liability of ISPs and email service providers who simply serve as a medium through which an offender disseminates prohibited material, but says nothing regarding the liability of commercial Web sites that use PIN numbers. Va.Code Ann. § 18.2-391 (Mi-chie Supp.1999) (amended 2000).
Furthermore, using the Supreme Court of Virginia’s language in American Booksellers, there is no indication that the use of a PIN number would be considered a “reasonable step” to prevent “reasonably apparent” perusal by juveniles. As the Plaintiffs have previously pointed out, the Commonwealth would certainly not agree that a liquor or tobacco store that sold to anyone with a valid credit card number, without some additional step to ascertain the age of the customer, was taking reasonable steps to exclude juveniles from the purchase of age prohibitive products. Other courts have questioned both the reasonableness and effectiveness of credit card verification, and there is no indication that the Virginia legislature intended to adopt PIN number verifications as an affirmative defense to section 18.2-391. This Court has no authority to include an affirmative defense to section 18.2-391 where the Virginia legislature has given no indication (explicit or implicit) that it intended to include said defense.
Finally, the Commonwealth’s PIN number solution to the statute’s First Amendment problems creates First Amendment problems of its own. The District Court explained that the stigma associated with the content of these Internet sites may deter adults from visiting them if they cannot do so without the assurance of anonymity. The Court pointed out that many adults may be unwilling to provide their credit card number online, and would *237 therefore not visit the site. Such a restriction would also serve as a complete block to adults who wish to access adult material but do not own a credit card. Such requirements would unduly burden protected speech in violation of the First Amendment.[3]
The District Court was correct in its conclusion that requiring adult Web sites to utilize PIN numbers would unconstitutionally chill free speech. In that the Commonwealth’s proposed construction would still render section 18.2-391 unconstitutional under the First Amendment, it would make no sense for this Court to adopt that construction.
The Commonwealth also asks this Court to construe section 18.2-391 in a manner that would virtually exempt bulletin boards and chat rooms from its regulations. The Commonwealth correctly points out that the 2000 amendment to section 18.2-391 limits the liability of service providers who do nothing more than set up the Internet chat room or bulletin board. See Va.Code Ann. § 18.2-391 (Michie Supp.1999) (amended 2000). The amendment does not, however, exempt the speakers who post material in chat rooms and on bulletin boards.
The Commonwealth admits that individual speakers who post messages in chat rooms or on bulletin boards for “commercial purposes” will still be subject to regulation under section 18.2-391. The Commonwealth seems to suggest that the number of Internet users engaged in this type of speech is so small that a ban on this commercial speech in these forums is permissible.[4] However, the number of individuals engaged in a particular type of speech is not determinative of whether First Amendment protections must be afforded to that type of speech.
As the District Court pointed out, participants in online chat rooms and discussion groups have no way to tell when participants from another state join the conversation or whether that participant is a minor. Dist. Ct. Op. J.A. at 299. As such, speakers could never engage in commercial adult speech in these types of forums without subjecting themselves to the possibility of criminal liability. In essence, speech that receives complete protection as to adults could never be engaged in unless the particular chat room or bulletin board completely banned juveniles.[5] Furthermore, banning juveniles from these particular formats would prevent them from accessing the beneficial materials, ie. non-sexually explicit materials, they contain. By the Commonwealth’s own admission, section 18.2-391 cannot be construed *238 in a way that completely exempts chat rooms and bulletin boards. The blanket prohibition of adult commercial speech that the statute imposes violates the First Amendment.
Even if the Court completely construed section 18.2-391 in the manner that the Commonwealth requests, such a construction would leave the Act virtually powerless. When the government defends a regulation of speech as a means to redress past harms or prevent anticipated harms, it must do more than simply “posit the existence of the disease sought to be cured.” Turner Broad. Sys. v. F.C.C., 512 U.S. 622, 664, 114 S.Ct. 2445, 129 L.Ed.2d 497 (1994) (quoting Quincy Cable TV, Inc. v. FCC, 768 F.2d 1484, 1455 (D.C.Cir.1985)). “It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.” Id. at 624, 114 S.Ct. 2445; see also Edenfield v. Fane, 507 U.S. 761, 770-71, 113 S.Ct. 1792, 123 L.Ed.2d 543 (1993)(explaining that the burden is on the party seeking to uphold a restriction on commercial speech to “demonstrate that the harms it recites are real and that its restriction will in fact alleviate them to a material degree”); Los Angeles v. Preferred Communications, Inc., 476 U.S. 488, 496, 106 S.Ct. 2034, 90 L.Ed.2d 480 (1986) (explaining that a “[c]ourt may not simply assume that the ordinance will always advance the asserted state interests sufficiently to justify its abridgment of expressive activity”). Where strict scrutiny applies, a statute that “leaves appreciable damage to th[e] supposedly [compelling] interest” uncorrected is invalid. Church of the Lukumi Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 547, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993) (internal citations omitted). Even commercial speech regulation “may not be sustained if it provides only ineffective or remote support for the government’s purpose.” Central Hudson Gas & Electric Corp. v. Public Service Comm’n of N.Y., 447 U.S. 557, 564, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980).
In order to avoid being too burdensome on protected speech, the statute cannot, by the Commonwealth’s own admission, protect Virginia juveniles from foreign or out-of-state Internet materials, regulate noncommercial Internet materials, or regulate materials posted on bulletin boards or in chat rooms. Given the nature of the Internet, such a construction would leave section 18.2-391 virtually powerless. In the District Court’s findings, it explained that “Communications on the Internet do not ‘invade’ an individual’s home or appear on one’s computer screen unbidden. Rather, the receipt of information ‘requires a series of affirmative steps more deliberate and directed than merely turning a dial.’ ” Dist. Ct. Op. J.A. at 296 (quoting Reno, 521 U.S. at 854, 117 S.Ct. 2329). As the District Court noted at oral argument, there is no benefit to a law which merely reduces the number of pornographic responses to an Internet search by a juvenile from 186,000 responses to 183,000 responses (hypothetically). J.A. at 908.
There is no indication that technology exists to track Web sites or Web site users in a manner that would give section 18.2-391 any bite. There is also no indication that a significant amount of harmful material available to juveniles in Virginia originates within the Commonwealth or comes from individuals who would be subject to the Commonwealth’s jurisdiction.[6] Fur *239 thermore, section 18.2-391 only regulates commercial Web sites, leaving a significant number of equally harmful, non-commercial Web sites, that could be screened by current Internet filtering technology, unregulated. See J.A. at 447.
In essence, the Commonwealth has failed to demonstrate in any way that section 18.2-391 passes Constitutional muster. Using the plain language of section 18.2-391 and banning the display of all “electronic file[s] or message[s],” containing “harmful” words, images or sound recordings, that juveniles may “examine and peruse,” is not a narrowly tailored solution and is unconstitutionally overbroad. On the other hand, using the proposed narrowing constructions renders section 18.2-391 powerless and therefore constitutes an impermissible regulation of speech under the First Amendment. See Church of the Lukmni Babalu Aye, Inc. v. City of Hialeah, 508 U.S. 520, 546, 113 S.Ct. 2217, 124 L.Ed.2d 472 (1993). Under either approach, section 18.2-391 unconstitutionally chills free speech and therefore violates the First Amendment.

2. Commerce Clause Analysis

Not only may the District Court’s decision be upheld based on section 18.2-391’s violation of the First Amendment, the decision may be upheld on the separate ground that the statute violates the Commerce Clause. The negative implication of the Commerce Clause (the Dormant Commerce Clause), U.S. Const. Art. I., § 8, cl. 3, includes a prohibition on state regulation that “discriminates against or unduly burdens interstate commerce and thereby imped[es] free private trade in the national marketplace.” General Motors Corp. v. Tracy, 519 U.S. 278, 287, 117 S.Ct. 811, 136 L.Ed.2d 761 (1997) (quoting Reeves, Inc. v. Stake, 447 U.S. 429, 437, 100 S.Ct. 2271, 65 L.Ed.2d 244 (1980)). Several courts have struck down state statutes similar to Virginia Code section 18.2-391 as unduly burdensome on interstate commerce because they, in effect, restrict commercial electronic materials in all states, not just the state in which the statute was enacted. For example, in American Libraries Ass’n v. Pataki, 969 F.Supp. 160 (S.D.N.Y.1997), the District Court found that because there was no effective way to limit access to online materials by geographic location, a Web site owner operating legally in California would have to comply with New York’s law to avoid being subject to liability there. Id. at 174. This may deter the California Web site from placing its material on the Internet, thereby affecting legitimate commerce outside of New York. At the least, the California Web site would have to incur the expense of complying with New York’s law if it were willing to post the materials at all (because materials accessible online in California are equally accessible online in New York).
Adopting the rationale of Pataki, the District Court rejected the Commonwealth’s arguments and analyzed section 18.2-391 as a direct regulation of interstate commerce. The Commonwealth attacks the conclusion reached by the District Court and argues that the statute should be construed narrowly to comply with the Dormant Commerce Clause. The Commonwealth argues that it should “be presumed ... that a legislative body ... did not intend to give its enactments an impermissible extra-territorial operation.” 82 C.J.S. Statutes § 310. The Commonwealth argues that the statute must be read not to have an impermissible effect *240 unless the language of the statute makes such a reading impossible. See Planned Parenthood v. Camblos, 155 F.3d 352, 383 (1998).
The Commonwealth asserts that through such a narrow construction the statute would not govern the “broad array of out-of-state Web sites” that have no contact with Virginia “other than being accessible here.” The logical conclusion of this argument is that the statute would only govern Web sites based in-state or Web sites with some other form of sufficient contacts with Virginia more substantial than merely being accessible here. The Commonwealth does not specify what those types of contacts might be.
As the District Court pointed out, the nature of the Internet itself makes the Commonwealth’s proposed construction nearly impossible. “The unique nature of the Internet highlights the likelihood that a single actor might be subject to haphazard, uncoordinated, and even out-right inconsistent regulation by states that the actor never intended to reach and possibly was unaware were being accessed.” Pa-taki, 969 F.Supp. at 168. Given the broad reach of the Internet, it is difficult to see how a blanket regulation of Internet material, such as section 18.2-391, can be construed to have only a local effect. See Reno, 521 U.S. at 887-95, 117 S.Ct. 2329 (Justice O’Connor, concurring in part and dissenting in part) (discussing the difficulty in applying principles of zoning law to the Internet).
However, even if the Commonwealth’s limiting construction were applied, the Act would nonetheless be an invalid indirect regulation of interstate commerce because the burdens it imposes on interstate commerce are excessive in relation to the local benefits it confers. In Pike v. Bruce Church, Inc., 397 U.S. 137, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970), the Supreme Court set forth the balancing test applicable to indirect regulations of interstate commerce. The two-fold inquiry first looks at the legitimacy of the state’s interest and secondly weighs the burden on interstate commerce in light of the local benefit derived from the statute. Pike, 397 U.S. at 142, 90 S.Ct. 844. There is no question that Virginia has a compelling interest in protecting the physical and psychological well-being of minors. The local benefits of such a statute, however, have not been proven.
By construing the Act so that it only reaches intrastate communication, the Commonwealth again finds itself in the same conundrum as it did in its First Amendment analysis. If the Commonwealth is capable of limiting its Internet regulation as not to directly offend the Commerce Clause, then it will have no local benefit given the vast number of other communication options available to a juvenile seeking them.
Even if section 18.2-391 can be construed in a manner that does not directly violate the Commerce Clause, the statute still fails under the Dormant Commerce Clause analysis of Pike v. Bruce Church. The District Court was correct in granting Plaintiffs’ Motion for Summary Judgment because section 18.2-391 violates the Commerce Clause.
III. Conclusion
The content of the Internet is analogous to the content of the night sky. One state simply cannot block a constellation from the view of its own citizens without blocking or affecting the view of the citizens of other states. Unlike sexually explicit materials disseminated in brick and mortar space, electronic materials are not distributed piecemeal. The Internet uniformly and simultaneously distributes its content worldwide. As the District Court noted, *241 there may some day be sufficient technology to render this statute constitutional. However, in light of current technology, the statute cannot be reasonably construed to meet both First Amendment and Commerce Clause challenges. The District Court was correct in granting Plaintiffs’ Motion for Summary Judgment and granting a permanent injunction against section 18.2-391. Therefore, the District Court’s decision is hereby

AFFIRMED.

. We do not recite here the specifics of how the Internet functions; where necessary, we describe any relevant features of the Internet in our analysis of this case. We note that the general contours of the Internet have been described in various other judicial opinions. See Reno v. ACLU, 521 U.S. 844, 849-57, 117 S.Ct. 2329, 138 L.Ed.2d 874 (1997); Cyberspace, Communications, Inc. v. Engler, 55 F.Supp.2d 737, 740-44 (E.D.Mich.1999); American Libraries Ass’n. v. Pataki, 969 F.Supp. 160, 164-67 (S.D.N.Y.1997); Shea v. Reno, 930 F.Supp. 916, 925-34 (S.D.N.Y.1996).

. It is assumed only adults will have credit cards because only adults are contractually obligated to pay back credit card charges. But see, Reno, 521 U.S. at 881-82, 117 S.Ct. 2329 (where the Supreme Court questioned the validity of a PIN number defense because the appellants failed to establish that a PIN number system would adequately screen out juveniles).

.The dissent cites to Ashcroft v. ACLU, 535 U.S. 564, 583 n. 14, 122 S.Ct. 1700, 152 L.Ed.2d 771 (2002), for the proposition that the Supreme Court has recognized "adult identification screens” as a feasible Internet alternative. The Court in Ashcroft, however, focused exclusively on the use of "community standards” to screen "obscene” Internet speech, an area that falls outside the purview of the First Amendment. The Court in Ashcroft explicitly stated that it did not "express any view" as to whether the Child Online Protection Act, and its use of adult identification screens, would survive a strict scrutiny analysis. Ashcroft, 535 U.S. at 585-86, 122 S.Ct. 1700.

. The Commonwealth makes this argument in spite of the fact that the term speech for "commercial purposes” remains undefined by section 18.2-391.

. The Commonwealth has been unable to suggest any equivalent to the adult verification measures currently available to commercial Web site operators that could be utilized by individuals wishing to engage in protected commercial speech in chat rooms or on bulletin boards.

. See ACLU v. Reno, 929 F.Supp. 824, 882-83 (E.D.Pa.1996) (explaining that "[njearly half of Internet communications originate outside the United Stales, and some percentage of that figure represents pornography,” and that "[plornography from, say, Amsterdam will be *239 no less appealing to a child on the Internet than pornography from New York City, and residents of Amsterdam have little incentive to comply with the CDA.”)