## CIRCUIT COURT OF LOUDOUN COUNTY

Commonwealth of Virginia                    .

    v.

Jeremy Jaynes

                Case No. Cr. 15585

Commonwealth of Virginia

    v.

Richard Rutkowski

                Case No. Cr. 15586

Commonwealth of Virginia

    v.

Jessica DeGroot

                Case No. Cr. 16121

                August 11, 2004

BY JUDGE THOMAS D. HORNE

Defendants have been charged in multiple count indictments with felony violations of the Virginia statute governing the transmission of unsolicited bulk electronic mail (Spam). Va. Code Ann. § 18.2-152.3:1. The relevant statute, otherwise known as "TUBES," provides, in relevant part, as follows:

> A. Any person who:
>
> 1. Uses a computer or computer network with the intent to falsify or forge electronic mail transmission information or other routing information in any manner in connection with the transmission of unsolicited bulk electronic mail through or into the computer network of an electronic mail provider or its subscribers ... is guilty of a Class 1 misdemeanor.
>
> B. A person is guilty of a Class 6 felony if he commits a violation of subsection A and:
>
> 1. The volume of UBE transmitted exceeded 10,000 attempted recipients in any 24-hour period, 100,000 attempted recipients in any 30-day time period, or one million attempted recipients in any one-year time period. . . .

Va. Code Ann. § 18.2-152.3:1

Motions to dismiss have been filed by the several defendants challenging the statute on constitutional grounds. These motions have been thoroughly briefed and argued by counsel. Having taken the matter under advisement, the Court finds that, with possibly one exception, the provisions of Va. Code Ann. § 18.2-152.3:1 survive constitutional scrutiny and the motions should be denied.

The defendants suggest that TUBES is unconstitutional in that it violates the First Amendment's protection of free speech, contravenes due process protection against vagueness, is inconsistent with the Commerce Clause, and offends double jeopardy principles. On Wednesday, June 16, 2004, counsel for the parties appeared before the Court to present oral argument and evidence relevant to the motions.

*First Amendment*

Defendants mount a broad, general, facial First Amendment challenge, claiming that TUBES is unconstitutional. Two arguments are sponsored in support of this position. First, they suggest that TUBES is an unlawful content-based prior restraint on speech. Secondly, it is their position that the statute violates their right to correspond anonymously.

The speech that the defendants suggest is subject to regulation is the "electronic mail transmission information or other routing information." This argument relies heavily upon the supposition that the subject line of the e-mail header is part of the "transmission information or other routing information." However, the subject line is the only part of the header that would exhibit any statements, opinions, or expressions of the sender and, therefore, is the only component that can truly be argued to contain any content protected by the First Amendment. An analysis of the argument must therefore begin with an examination of the meaning of the terms "transmission or other routing information" in the context of the statute.

While penal statutes are strictly interpreted against the Commonwealth, courts are not shackled to an unreasonably restrictive standard. They are still free to use established rules of statutory construction to give meaning to the action of the legislature. *Alger v. Commonwealth*, 267 Va. 255, 259 (2004). Thus, the court is guided in its interpretation of the statute by the rule that:

> [U]nder basic rules of statutory construction, [it must] determine the General Assembly's intent from the words contained in the statute. When the language of a statute is unambiguous, courts are bound by the plain meaning of that language and may not assign a construction that amounts to holding that the General Assembly did not mean what it actually has stated.

*Id.* at 259.

Deference is afforded the actions of the legislature when such actions are subject to judicial review. Thus, such actions of the General Assembly are presumed constitutional and the Court must, on review, resolve any reasonable doubt respecting constitutionality in favor finding the statute valid. *Boyd v. County of Henrico*, 42 Va. App. 495, 507 (2004).

TUBES criminalizes the falsification or forging of "transmission or *other* routing information." Thus, the specific object of legislative interest is the falsification or forging of routing information. Through the use of the word

"other," it is clear that the legislature intended transmission information to be a subset of routing information. 17 M.J., *Statutes*, § 63 (2003).

The word "route" means "to select the course to be followed by a shipment by designating carrier, intermediate points, junctions and final delivery." *Webster's Third New International Dictionary* 1981 (1981). "Routing" is a form of the word route which means "the determination of a course and method of shipment." *Id.* In the internet-working world, "routing" is "the process of moving a packet of data from source to destination," a task performed by a router. *Webopedia*, http://www.webopedia.com/TERM/R/routing.html.

"Routing information" is the information that allows a data packet, in this case, an e-mail message, to travel a course from origin to destination. It has been observed that:

> [t]he Internet is designed around "smart communications." Because it is a network of computers, mechanical intelligence is available at every node of the network, and the design of the Internet takes full advantage of this characteristic. Computers at each node monitor traffic on the network and route packets along the least congested route to the next node, from which the process is repeated. Each computer in the network assesses whether to hold packets temporarily or send them on, so that maximum use is made of the available carrying capacity at any given time.

Dan E. Burk, *Federalism in Cyberspace*, 28 Conn. L. Rev. 1095, 1098 (1996).

A persuasive argument may be made that the subject line of the e-mail message is not routing information. If it were, then the completion of the subject line of an electronic mail would be necessary to the proper delivery of the message to a recipient. Practical experience of even the most unsophisticated user of the Internet would suggest that this is not the case. The subject line aids the receiver of the message only to determine the subject of what he or she is about to open. It is akin to writing "Happy Birthday" on the outside of an envelope to the birthday card one has sent a friend. Although it is the subject and the reason for the card, the post office does not need to know that it is the recipient's birthday to determine how to send the card along its way.

The cases relied upon by the Defendants are of little assistance to their argument as they involve content-based regulations. *Bolger v. Youngs Drug Products Corp.*, 463 U.S. 60 (1983); (unconstitutional restriction on unsolicited mailings concerning contraceptives); *Lysaght v. New Jersey*, 837 F. Supp. 646 (N.J. 1993) (unconstitutional restriction of delivery of prerecorded telephone commercial advertisements); *Spencer v. Justices of the Supreme Court*, 579 F.

Supp. 880 (E.D. Pa. 1984) (ban on direct mail solicitation by lawyers unconstitutional because it did not ban all forms of direct mail solicitation); *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803 (2002) (federal law unconstitutional because it was content based, only placing a restriction on sexually explicit television programming); *Reno v. ACLU*, 521 U.S. 844 (federal laws attempted to restrict "indecent," "obscene," or "patently offensive" material on the Internet); *PSINet, Inc. v. Chapman*, 362 F.3d 227 (4th Cir. 2004) (Virginia statute attempting to regulate Internet speech "harmful to minors" ); *Ashcroft v. ACLU*, 124 S. Ct. 2783 (2004) (statute attempting to criminalize the "knowing posting" of material for "commercial purposes" that is "harmful to minors" ).

Of the sometimes-fractious relationship between freedom of expression and the exercise of the police power, it has been said:

> To safeguard free speech, the Supreme Court requires that a regulatory measure be content neutral. The doctrine of content neutrality provides that governmental regulations may not restrict expression because of its message, its ideas, its subject matter, or its content. ... The doctrine of content neutrality, however, does not preclude all governmental regulation that restricts expression. Restrictions on the time, place, and manner of expressions are permissible if they are justified without reference to the content of the regulated speech ... serve a significant governmental interest, and ... leave open ample alternative channels for communication of information.

*Adams Outdoor Adv. v. City of Newport News*, 236 Va. 370, 381, 382 (1988) (authorities omitted).

Were the Court to assume the statute implicates the First Amendment, it may be fairly asserted that the routing information would affect only the manner in which the protected speech is conveyed and not the content of the message. The statute under consideration seeks to address the concern of the General Assembly for the economic impact of unsolicited electronic mail on recipients and those involved in the transmission process. Unlike statutes directed towards limiting access to pornography, spam legislation is concerned with the volume of transmissions. TUBES reflects a legislative concern for the injurious economic consequences to mail providers and subscribers occasioned by large infusions of unsolicited data generated by those who would purposely forge or falsify their identity and thereby avoid filtering or

blocking. Legislative efforts to control the volume of electronic mail serve an important government interest. Congress has determined that:

> (1) Electronic mail has become an extremely important and popular means of communication, relied on by millions of Americans on a daily basis for personal and commercial purposes. Its low cost and global reach make it extremely convenient and efficient, and offer unique opportunities for the development and growth of frictionless commerce.

> (2) The convenience and efficiency of electronic mail are threatened by the extremely rapid growth in the volume of unsolicited commercial electronic mail. Unsolicited commercial electronic mail is currently estimated to account for over half of all electronic mail traffic, up from an estimated 7 percent in 2001, and the volume continues to rise. Most of these messages are fraudulent or deceptive in one or more respects.

Controlling the Assault of Non-Solicited Pornography and Marketing (CAN-SPAM) Act of 2003, Pub. L. No. 108-187, § 2 (2003).

The public interest identified by Congress is one shared by both the states and the federal government.

Lastly, the statute limits only the use of false or forged transmission or other routing information by senders of electronic mail. It has left open other channels of communication for those seeking to get their message to the general public.

Assuming that TUBES is content based and subject to a strict scrutiny analysis governing judicial review of a frontal assault on free expression, it must likewise fail. It is a restriction on free speech to require everything that one pens or speaks be truthful even if the untruthful statements are negligently made. However. the Constitution holds no protection for misstatements knowingly made. In *New York Times Co. v. Sullivan*, the Court held that calculated falsehood enjoyed no immunity in the case of alleged defamation of a public official. *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964). In *Time, Inc. v. Hill*, the Court stated that calculated falsehood should enjoy no immunity in the case of the magazine publishing a review of a play and giving the knowingly false impression that the play depicted a true story. *Time, Inc.*, 385 U.S. 374, 390 (1967). Thus:

> Although honest utterance, even if inaccurate, may further the fruitful exercise of the right of free speech, it does not follow that the lie, knowingly and deliberately published ... should enjoy like immunity. . . .

> For the use of the known lie as a tool is at once at odds with the premises of democratic government and with the orderly manner in which economic, social, or political change is to be effected.

*Time, Inc. v. Hill*, 385 U.S. 374, 390 (1967) (quoting *Garrison v. Louisiana*, 379 U.S. 64, 75 (1964)).

Negligent mistakes are excluded from the criminal conduct defined by the statute. In order to inculpate the actor, it is necessary that the finder of fact determine that the offender transmitted unsolicited bulk electronic mail with the specific intent to falsify or forge electronic mail transmission information or other routing information. The volume of mail transmitted would then affect the punishment. A conviction can only be supported by proof beyond a reasonable doubt that the person charged knowingly and intentionally falsified or forged transmission or other routing information in connection with the sending of bulk electronic mail. One who knowingly or recklessly practices deceit cannot then argue for protection under the First Amendment.

Defendants also mount a First Amendment challenge to the statute based upon their claim that it prohibits one's ability to speak anonymously over the Internet. The Supreme Court has noted the grave importance of protecting the freedom to publish anonymously, *McIntyre v. Ohio Elections Commission*, 514 U.S. 334 (1995). In that case, an Ohio statute required campaign literature to bear the issuer's name and address. Ms. McIntyre was prosecuted, convicted, and fined for distributing anonymous pamphlets opposing a proposed school tax to persons attending a public meeting. The Court struck down this provision, holding that it violated the First Amendment by penalizing anonymous speech. In its opinion, the Court noted the penalized speech was related to a political campaign, the most important type of speech to be protected in a democratic society.

Significantly, the Court in *McIntyre* found that there was nothing in the record to suggest that the message conveyed by Ms. McIntyre was false, misleading, or libelous. A review of the history of the case reveals that the Franklin County Court of Common Pleas reversed the trial court, finding that Ms. McIntyre did not "mislead the public nor act in a surreptitious manner" in handing out the leaflets. *McIntyre*, at 339. Moreover, the Supreme Court noted

that the challenged Ohio statute contained, "no language limiting its application to fraudulent, false, or libelous statements." *Id.*, at 344. Thus, the Supreme Court in *McIntyre* makes an important distinction between "anonymous authors" and those "wrongdoers who might use false names and addresses in an attempt to avoid detection," implying that the former group enjoys First Amendment protection, while the latter does not. *Id.*, at 353.

TUBES does not penalize innocent e-mail authors who seek to be anonymous (whether out of a desire to retain one's privacy or out of fear of prosecution). It is an enforcement mechanism to sanction abuses of private property interests through purposeful falsification of routing information. *CompuServe, Inc. v. Cyber Promotions, Inc.*, 962 F. Supp. 1015 (S.D. Ohio 1997); *Cyber Promotions, Inc. v. America Online, Inc.*, 948 F. Supp. 436 (E.D. Pa. 1996). TUBES does not require that one reveal his or her identity. It simply requires that one not intentionally falsify any information used by a router.

The right to write and publish anonymously is not a concept that is foreign to Internet litigation. Internet service providers have claimed standing to protect such rights of their subscribers. In answer to concerns about anonymous Internet speech, the General Assembly has developed unique procedural protocols to address the access of third parties to subscriber information. Va. Code Ann. § 8.01-407.1.

TUBES prohibits criminal conduct directed to property rights of electronic mail providers and their subscribers. It is limited to those instances where a specific criminal intent is shown to have motivated the transmission of unsolicited bulk electronic mail and that such transmission was of a certain volume into or through a computer network of an electronic mail provider or its subscriber located in the Commonwealth. The statute does not criminalize freedom of expression nor the right to speak on issues of public interest without fear of reprisal. *McIntyre* simply does not apply to the instant case. As has been previously noted, TUBES requires that the Commonwealth prove that the defendants specifically intended to falsify and forge the routing information.

The defendants' motion to dismiss on grounds of a violation of the First Amendment guarantee of free speech is denied.

*Due Process*

The defendants suggest that the several indictments against them should be dismissed on due process grounds. They argue that the provisions of TUBES are impermissibly vague and therefore violate the Fourteenth Amendment of the Constitution. They suggest that such terms as unsolicited," "bulk," "falsify or forge," and "transmission information or other routing information" are unconstitutionally vague. Although the Virginia computer crimes act provides definitional guidance for certain words and phrases, it does not speak to these terms. Va. Code Ann. § 18.2-152.2. Accordingly, the Court must look to standard dictionary definitions as a guide to statutory interpretation.

Vagueness is determined by the standard of whether ordinary people of common intelligence would have to guess at the meaning of the terms used or whether the language used would permit selective and discriminatory enforcement. *Smith v. Goguen,* 415 U.S. 566, 574, 576 (1974).

One may have standing to assert a constitutional due process challenge to a penal statute when the language of the statute "as applied" to his or her conduct is impermissibly vague. *Stanley v. City of Norfolk,* 218 Va. 504, 506 (1977). In distinguishing speech and due process claims, it has been held that:

> [i]t seems clear that, when overbreadth impinges upon First Amendment guarantees, a person accused under the statute has standing to make a facial attack, even though his own speech or conduct was not constitutionally protected; when overbreadth has only due process implications, he has no standing to make a facial attack but only standing to challenge the statute as applied to his own conduct.

*Id.* at 508.

To prevail on the instant motion, the defendants must show that an ordinary person would not understand the language of the statute as it is applied to their conduct or that the language used would lead to selective enforcement.

The defendants are charged under the felony provisions of the statute. To support a conviction, the Commonwealth must, among other things, prove that a certain volume of mail was transmitted during specified periods. Thus, the fact that proof of the electronic mail sent is a prohibited "bulk" transmission is established by evidence of the volume of mail transmitted in 24 hours, 30 days, or one year. Unlike some jurisdictions, Virginia has not sought otherwise to limit the term "bulk electronic mail" to commercial mail.

Accordingly, the Court finds that, the felony provisions of TUBES satisfy constitutionally protected due process requirements in that the volume of the transmissions is clearly delineated. Thus, the public is on notice as to the precise limitations on their conduct. However, the misdemeanor provisions of TUBES are constitutionally suspect both because of their failure to qualify, by type or quantify by number, the meaning of "bulk" electronic mail. However, defendants have not been charged with the misdemeanor violations and, therefore, the Court need not consider the lesser offense at this time. Should the issue arise at trial, based upon the proof given and a consideration of familiar principles relating to lesser-included offenses, the defendants may ask the Court to revisit this issue.

An ordinary person would understand "unsolicited" to mean "not asked for: granted or given without request;" that is the definition in *Webster's Third New International Dictionary* 2511 (1981). Because the Defendants are charged with sending e-mails that were not requested, this term is not vague as applied to the conduct charged.

"Transmission" and "routing" have generally understood plain meanings. *Webster's* defines "transmit" as "to cause to go or be conveyed to another person or place." *Id.* at 2429. "Routing" is defined as "a course of travel," or "transmission over a selected course." *Id.* at 1981. Therefore, "transmission information or other routing information" means information that allows an e-mail to travel a course to go to another person or place.

The plain meaning definitions of the words "falsify" and "forge" are found in *Webster's*. "Falsify" means "to make false by mutilation or addition: tamper with," or "to represent falsely: misrepresent, distort." *Id.* at 820. "Forge" means "to make or imitate falsely." *Id.*, at 891. Furthermore, it has been held that:

> [A] specific "scienter requirement" in an ordinance (requiring that criminal culpability be grounded on knowing violations of law further protects a law) from a vagueness challenge. ... A scienter requirement "may mitigate a law's vagueness, especially with respect to the adequacy of notice to the complainant that his conduct is proscribed."

*Boyd v. County of Henrico*, 42 Va. App. 495, 519 (2004) (authorities omitted).

Accordingly, the Court finds that each of the terms of the statute should be given their plain meanings and should be harmonized with each other. In so doing, a reasonable person would be able to govern their conduct in a way to

access the Internet for the purpose of transmitting electronic mail from anywhere in the world without fear of criminal prosecution in Virginia.

The motion to dismiss the felony charges on due process grounds against the defendants is denied. In so far as the misdemeanor provisions of the act are not presently before the Court, the motion is reserved.

### Double Jeopardy

The defendants have moved to dismiss either count one or counts two, three, and four of the indictments returned against them on the grounds that the conviction on all four counts would violate their Constitutional rights protecting them from double jeopardy.

The Fifth Amendment to the Constitution provides that an accused shall not be "subject for the same offense to be twice put in jeopardy of life or limb." U.S. Const., amend. V. Although the Double Jeopardy Clause prohibits successive prosecution or cumulative punishment for the same offense, a prosecutor may charge a defendant under multiple theories concerning the same crime in a single proceeding. *Ohio v. Johnson*, 467 U.S. 493, 499 (1984); *Clagett v. Commonwealth*, 252 Va. 79 (1996).

The instant indictments charge distinct and separate times when the discrete acts of legislatively proscribed criminal conduct are alleged to have been committed. *Dingus v. Commonwealth*, 23 Va. App. 382 (1996). They insult neither the double jeopardy bar against multiple prosecutions nor punishments for the same offense.

Accordingly, the Motion to Dismiss on double jeopardy grounds is denied.

### Commerce Clause

The Commerce Clause of the Constitution provides that, "[t]he congress shall have power … to regulate commerce … among the several states." U.S. Const., art. I, § 8, cl. 3. Courts have wrestled with how to apply a rich history of historical Commerce Clause jurisprudence to a communication medium that knows no geographic or political boundaries; and through which messages travel in dissected electronic data packets only to become readable upon arrival at an intended address, that may be identified in a way that leaves the recipient and sender innominate, excepting only by a series of letters or numbers.

It has been recognized that the Commerce Clause contains a "dormant" directive that limits a state's ability to "discriminate against or unduly burden

interstate commerce and, thereby, impede free private trade in the national marketplace." *PSINET, Inc. v. Chapman*, 362 F.3d 227, 239 (4th Cir. 2004) (citing *General Motors Corp. v. Tracy*, 519 U.S. 278, 287 (1997) (further citations omitted). Of the Commerce Clause and the Internet, it has been written:

> In evaluating a state statute under the Commerce Clause, a court must distinguish statutes that directly discriminate against interstate commerce from those statutes that burden interstate commerce only incidentally. If a statute is, on its face, discriminatory against interstate commerce, a court must apply a "strict scrutiny" analysis. Under this analysis, a state statute will be held invalid unless the state has no other means to advance a legitimate local interest. On the other hand, if a state statute is non-discriminatory on its face but nonetheless impinges on interstate commerce, a court must apply a balancing test.
>
> Under the balancing test, the state statute is invalid only if the burden imposed on interstate commerce is clearly excessive in relation to the statute's putative local benefits. An important part of the balancing test also involves examining whether, "the practical effect of the regulation is to control conduct beyond the boundaries of the State, frequently referred to as the "extraterritorial effect" prong. Another consideration to balance is whether the state regulation adversely affect[s] interstate commerce by subjecting activities to inconsistent regulations, frequently referred to as the "inconsistent regulations" prong. At least three commentators have called the dormant Commerce Clause "a nuclear bomb of a legal theory" against all state regulation of the Internet.

2 International Authors, *Internet Law and Practice*, § 25:3, at 25-4 (citations omitted).

The Internet has become fertile ground for dormant Commerce Clause challenges to state laws that attempt to regulate the actions of individuals and businesses utilizing the international communication infrastructure system known as the Internet. *PSINet, Inc. v. Chapman*, 362 F.3d 227, 239 (4th Cir. 2004); *State v. Heckel*, 93 P.3d 189 (Wash. App. 2004); *American Libraries Ass'n v. Pataki*, 969 F. Supp. 160 (S.D. N.Y. 1997). Indeed, the district court characterized the Internet as being analogous to a highway, railroad, or other,

"more traditional instruments of interstate commerce." *American Libraries Ass'n*, at 161.

Like persistent state efforts to regulate highway and railroad based commerce, efforts have been made by many states, including Virginia, to enact laws to address abuses of the Internet. Among these laws are those that seek to address the issue of unsolicited bulk mail or "spam." It has been observed that:

> Perhaps the earliest recorded use of "spam" in the electronic online sense was an incident in the middle 1980s, in which a participant in an early, primitive chat room created a macro that repeatedly typed the word "SPAM" interfering with the other participants' ability to chat.

> At present, 25 states have enacted so-called "anti-spam" laws that attempt to prohibit or regulate unsolicited e-mail (known colloquially as "spam" ). Some states merely require the subject line of all spam to be clearly labeled as "ADV" (advertising). Other states have different requirements. This patchwork quilt of varying state regulations have led to concerns among several courts regarding whether state anti-spam laws may violate the dormant Commerce Clause.

2 International Authors, *Internet Law and Practice*, § 25:22 at 25-23, 25-24 (2003).

As previously noted, the defendants have been indicted on four counts of violating TUBES. The elements of all four counts are the same; the only variation is the number of e-mails allegedly sent or the time period of the alleged transmission of those e-mails. Each of the counts alleges that the unsolicited bulk e-mail (UBE) in question was sent through a server located in Loudoun County, Virginia.

Defendants allege the statute violates the dormant Commerce Clause in three ways. First, they suggest that TUBES is a *per se* violation because it has the practical effect of controlling the commerce of other states. Secondly, they argue that the burden of TUBES on interstate commerce outweighs any local benefits provided by the statute. *Pike v. Bruce Church*, 397 U.S. 137 (1970). Lastly, it is their position that the application of TUBES subjects distributors of UBE to inconsistent state regulation.

A statute may discriminate in practical effect if it directly controls commerce occurring wholly outside the boundaries of a state. *Healy v. The*

*Beer Inst.*, 491 U.S. 324, 336 (1989). TUBES regulates e-mails that originate, terminate, or are transmitted through the "computer network of an electronic mail service provider or its subscribers. . . ." Va. Code Ann. § 18.2-152.3:1(A). If commerce must avail itself of an infrastructure pathway through a state, its progress is clearly within the state at that point, regardless of its final destination.

An Arkansas state law that required the railroads to have a specific number of crewmembers aboard a train was upheld, despite the fact that the majority of affected trains were just "passing through" the state. *Brotherhood of Locomotive Firemen & Enginemen v. Chicago, Rock Island & Pacific RR.*, 393 U.S. 129, 135 (1968). The acts of the Defendants, alleged in this case, must be shown to have occurred within the boundaries of the County of Loudoun within the Commonwealth of Virginia. It would have to be established that either the unsolicited bulk electronic mail was transmitted through or into a computer network of an electronic mail provider or one or its subscribers located in Loudoun County, Virginia. Although only pieces of electronic data may pass through Virginia, TUBES directly regulates commerce occurring within the Commonwealth. Therefore, the practical effect of the statute is not to regulate commerce occurring outside the Commonwealth, and it does not constitute a *per se* violation of the dormant Commerce Clause.

The Supreme Court established a two-step inquiry in assessing dormant Commerce Clause violations. Judicial review must take into consideration, (1) the legitimacy of the state's interest in the enforcement of the statute, and (2) the burden on interstate commerce weighed against the local benefit gained by the state through application of the statute. *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). The Commonwealth clearly has an interest in the protection of the property interests of its citizens. Private networks, servers, and their subscribers located in the Commonwealth may be directly or indirectly affected by mass transmissions of unsolicited bulk electronic mail.

Congress has stated that "[t]he receipt of unsolicited commercial electronic mail may result in costs to recipients who cannot refuse to accept such mail and who incur costs for the storage of such mail, or for the time spent accessing, reviewing, and discarding such mail, or for both." 15 U.S.C. § 7701(3) (2004). Additionally, Congress went on to state that "[t]he growth in unsolicited commercial electronic mail imposes significant monetary costs on providers of Internet access services, businesses, and educational and nonprofit institutions that carry and receive such mail, as there is a finite volume of mail that such providers, businesses, and institutions can handle without further investment in infrastructure." 15 U.S.C. § 7701(6) (2004).

In opposition to the significant and apparent local benefits of TUBES, the only burden imposed upon interstate commerce is that UBE transmissions not

contain falsified or forged transmission or other routing information and that the sender, who wishes to so falsify or forge such transmissions, limit such transmissions to the minimum required by the statute. To require that disingenuous information, intentionally created, be deleted from the routing process is not a weighty burden, if a burden at all, to be imposed on any person or business choosing to send bulk e-mails, nor is it a burden upon other states and the limitations that they choose to impose upon UBE transmissions.

The dormant Commerce Clause does not prohibit a state from regulating commerce within its boundaries; it only seeks to protect inherently interstate forms of commerce from being unduly burdened by a single state's policies and to protect it from inconsistent regulations that burden commerce through their incompatibility. States have the authority to enact necessary police powers to regulate activities that "have the purpose and effect of encouraging domestic industry." *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271 (1984). Thus, the authority of the police power of the state may be harmonized with the strictures of the Commerce Clause.

The case of *Bibb v. Navajo Freight Lines*, cited by both parties, is illustrative of the difference between the regulations of multiple states that are not violative of the dormant Commerce Clause and inconsistent regulations between states that are constitutionally suspect. *Bibb v. Navajo Freight Lines, Inc.*, 359 U.S. 520 (1959). In *Bibb*, the Supreme Court noted that the Illinois trucking law at issue was struck down on a dormant Commerce Clause challenge solely because of the direct conflict between the two state laws, not because both states regulated the behavior.

In *Southern Pacific Co. v. Arizona ex rel. Sullivan*, the Supreme Court found that with respect to the regulation by a state of the length of railway trains passing through the state that, "examination of all the relevant factors make it plain that the state interest is outweighed by the interest of the nation in an adequate, economical, and efficient railway transportation service which must prevail." *Southern Pacific Co. v. Arizona ex rel. Sullivan*, 325 U.S. 761, 783, 784 (1945). By contrast, the enforcement of the Virginia statute requiring truth in routing information will not sabotage national and international efforts to make the make the Internet an effective, adequate, economical, or efficient means of communicating within our country and throughout the world.

A survey of state laws regulating bulk electronic mail finds that none conflict with the Virginia statute. Some seek to distinguish commercial mail from that which is not commercial. Others are more comprehensive than the Virginia statute. But the Virginia statute can be harmonized with all such state statutes and with the Controlling the Assault of Non-Solicited Pornography and Marketing (CAN-SPAM) Act, 15 U.S.C. §§ 7701-7713 (2004), effective

on January 1, 2004. It should be noted that the federal law supersedes state laws regulating commercial UBE with the exception of laws that, "prohibit falsity or deception in any portion of a commercial electronic mail message or information attached thereto." 15 U.S.C. § 7707 (2004).

A company "seek[ing] to do business in all fifty states must bear the cost of doing business in those states. That cost includes complying with all applicable national and state laws." *Silver v, Woolf*, 538 F. Supp. 881, 889 (D. Conn. 1982). Distributors of UBE must comply with the laws of Virginia if they seek to transmit UBE to electronic mail service providers or subscribers in the state. TUBES does not subject distributors of UBE with falsified or forged transmissions information to inconsistent, conflicting state regulations and, as such, is not a violation of the dormant Commerce Clause.

Recent commentators have written that:

> Even assuming that the antispam laws do not significantly further the state's interest, it is hard to see how the antispam laws burden interstate commerce at all. The spam laws essentially require truthfulness in the header, return address, and subject line of the e-mail. Far from burdening commerce, the truthfulness requirement facilitates it by eliminating fraud and deception. Compliance with the various antispam statutes is easy compared to noncompliance, which requires the spammer to incur costs of forging, re-mailing, and the like.

Jack L. Goldsmith and Alan O. Sykes, *The Internet and the Dormant Commerce Clause*, 110 Yale L.J. 785, 819 (2001).

As noted earlier, TUBES addresses only the transmission of information that may be considered a subset of routing information. Thus, its requirements are less intrusive than those the commentator expressed and would not constitute a burden on interstate commerce.

Although critical of state Internet laws as they affect interstate commerce, Judge Preska, in her insightful and thorough analysis of the Commerce Clause as applied to state regulation of the Internet, recognized that, although a New York Act governing child pornography placed an undue burden on interstate commerce, it was content based. *American Library Ass'n v. Pataki*, 969 F. Supp. 160, 182 (S.D. N.Y. 1997).

The instant statute is not content based, vague, or offensive to interstate commerce.

Accordingly, the Court will deny the motion to dismiss predicated upon the dormant Commerce Clause.